UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW LIMRON,

                  Plaintiff,          Civil Action No. 14-12890
                                       Honorable Judith E. Levy
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT THE COMMISSIONER'S
MOTION FOR SUMMARY JUDGMENT [11]**

      Plaintiff Matthew Limron ("Limron") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). The Commissioner filed an unopposed motion for summary judgment [11], which has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Limron is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's unopposed motion for summary judgment [11] be GRANTED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

II.     **REPORT**

A.     **Litigation History**

When Limron commenced this action, he was represented by attorney Richard Doud of the firm Davidson, Breen, Doud, Steele & Ferguson, P.C. (the "Firm"). Doud filed a motion for summary judgment on Limron's behalf on November 6, 2014. [9]. On April 18, 2015, attorney James Smith ("Smith") of the Firm moved to substitute into the action for attorney Doud on behalf of Limron. [12].

On May 20, 2015, this action was transferred to a three-judge panel (the "Panel") to address the Firm's representation of Social Security claimants in the Eastern District of Michigan. [5/20/15 docket entry]. Pursuant to 15-AO-033, on June 9, 2015, the Panel administratively stayed this action. [16]. On October 19, 2015, pursuant to 15-AO-045, the Panel determined that affected cases (including this one) would be transferred back to the originally assigned judge, and that it would be each such judge's responsibility to determine when to lift the stay. [10/19/15 docket entry]. Accordingly, on November 6, 2015, the Honorable Judith E. Levy issued an order lifting the stay in this matter and denying Smith's motion for substitution of counsel. [14].

The Court was later advised that the Firm had notified Limron that he would have until December 30, 2015, to retain a new attorney and have that attorney file an appearance in this action. [15]. Limron was also notified that if no such appearance was filed by December 30, 2015, the Court would consider Limron to be continuing his appeal without legal representation, *i.e.*, that he would be representing himself in this action *pro se*. [*Id.*]. Because no new attorney appeared on Limron's behalf, the Court deemed him to be representing himself *pro se*, ordered that his motion for summary judgment be stricken from the docket, and issued an amended scheduling order. [17]. To date, Limron has not filed a new motion for summary judgment and

the Commissioner has informed the Court that she will rely on her original brief [11].  [18].

### B.   Procedural History

On February 23, 2012, Limron filed an application for DIB, alleging a disability onset date of October 3, 2011.  (Tr. 67-79).  This application was denied initially on September 7, 2012.  (Tr. 81-84).  Limron filed a timely request for an administrative hearing, which was held on June 5, 2013, before ALJ Keith Kearney.  (Tr. 41-66).  Limron, who was represented by attorney Aaron Lemmens, testified at the hearing, as did vocational expert Kenneth Browde.  (*Id.*).  On August 9, 2013, the ALJ issued a written decision finding that Limron is not disabled.  (Tr. 17-36).  On May 23, 2014, the Appeals Council denied review.  (Tr. 1-3).  Limron timely filed for judicial review of the final decision on July 24, 2014.  (Doc. #1).

### C.   Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled

regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or his past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or his past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or his age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.   Background

#### 1.   *Plaintiff's Reports and Testimony*

In an undated disability report, Limron indicated that he suffers from rheumatoid arthritis in both of his hands, neuropathy, chronic pain syndrome and depression.  (Tr. 148).  He also indicated that he underwent several surgeries on his hands.  (*Id.*).  Limron reported that he stopped working on October 3, 2011, as a result of this condition. (*Id.*).  With respect to his education level, Limron completed the twelfth grade and did not pursue any further studies.  (Tr. 149).  He also takes various medications to treat his conditions, including Effexor for depression, and Neurontin and tramdadol for pain.  (Tr. 150).  Limron noted that he underwent two surgeries at the Mayo Clinic to "repair [his] hands."  (Tr. 152).

In a function report dated April 9, 2012, Limron stated that he lives in a house with his family.  (Tr. 156).  When asked to describe how his condition limits his ability to work, Limron stated: "I have major hand, wrist and arm injury [sic]. . . [m]y bones all rub together from my

4

knuckles to my arm bones.  I have chronic pain syndrome, depression, neuropathy and arthritis."
(*Id.*).  His daily routine consists of taking his pain medications and waiting for them to work.
(Tr. 157).  Limron reported that he can no longer work the sixty hours a week to which he was
accustomed.  (*Id.*).  He also has trouble sleeping on account of his back pain.  (*Id.*).  Limron
indicated that he has difficulty dressing because it is "hard to move."  (*Id.*).  He cannot bathe in a
tub as he is "afraid of falling."  (*Id.*).  Limron reported that he has difficulty performing basic
hygiene, feeding himself, and using the bathroom because his hands and fingers "do not work
very well."  (*Id.*).  He also has trouble remembering to bathe or to take his medicine.  (Tr. 158).
While he used to cook, he more recently prepares sandwiches and cereals once a week.  (*Id.*).
Limron reported that he tries to mow the lawn, but that the vibration from the mower "drives
[him] crazy."  (*Id.*).  He attempts to wash the dishes and clean the kitchen, although the pain in
his hands and feet limit his ability to stand and hold objects.  (*Id.*).  He is able to walk and drive
or ride in a car.  (Tr. 159).  Limron goes shopping once every two weeks for groceries, but has a
hard time walking on account of pain.  (*Id.*).  Limron is capable of paying bills, counting change,
and handling a checking and savings account under the supervision of his wife. (*Id.*).  His main
hobby used to be driving tractor-trailers.  (Tr. 160).

As for social activities, Limron stated that he does not spend as much time with other
people as he would like; he is very forgetful; and he can be very irritable in dealing with family
and friends.  (Tr. 160-61).  Limron noted that, "I used to love to be around a lot of people, now I
don't care if I see anybody."  (Tr. 161).

When asked to identify functions impacted by his condition, Limron checked lifting,
squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory,
completing tasks, concentration, understanding, following instructions, using his hands, and

5

getting along with others.  (Tr. 161).  He reported that he can walk for about five minutes before needing a break and that he must rest for approximately 15 minutes before resuming.  (*Id.*). Limron indicated that he has to study written instructions several times before he can implement them and that he does not follow spoken instructions very well.  (*Id.*).  He noted that he does not get along well with authority figures; he handles stress terribly; and he is always afraid of running out of pain medication.  (Tr. 162).  Regarding medications, Limron takes vicoden, tramadol, effexor and neurontin.  (Tr. 163,175).

Limron's wife also filled out a function report dated April 18, 2012.  She attested that Limron is "unable to work due to his hand/wrist injury and all of the following surgeries."  (Tr. 169).  She further noted that Limron "needs pain medication to even function when he wakes up. His day is then filled with sleep."  (Tr. 169).  His wife reported that she helps Limron by taking care of their children, cooking, cleaning, laundry, and preparing his medications.  (*Id.*).  He wakes up during the night crying and moaning in pain and asks for medication, heating pads or message therapies.  (*Id.*).  She noted that Limron's memory has been severely compromised to the extent that he needs reminders to take medication; to locate lost objects; and [for] hygiene issues.  (*Id.*).  Limron requires assistance to finish household chores after approximately ten minutes because he suffers significant pain.  (Tr. 170).  She reported that Limron can only drive short distances because his pain medication makes him drowsy.  (Tr. 171).  He can otherwise walk and ride in a car or a golf cart.  (*Id.*).  Limron's wife confirmed that she assists him with financial matters and that he engages in social activities about once a week by going to church or speaking with neighbors. (Tr. 172).  She has to remind Limron to go to his doctors' appointment twice a month and she often goes with him to ensure that he follows the doctors' instructions. (*Id.*).  She indicated that Limron is prone to mood swings and suffers from depression.  (Tr. 173).

He cannot follow written or verbal communications very well; he has trouble navigating stressful situations; and it is difficult for him to handle changes in routine (*Id.*).  Limron's wife also noted that doctors prescribed him a splint for daily use since 2009.  (Tr. 174).

On September 7, 2012, Sarah Bancroft-Treadway, M.D., the state agency reviewer, found that Limron could perform unskilled light work with the following limitations: occasionally lifting 20 pounds; frequently lifting 10 pounds; sitting, standing and/or walking six hours in an eight-hour workday; limited pushing and/or pulling with the upper extremities; never climbing ladders, ropes or scaffolds; frequent ramp climbing and balancing; limited handling and fingering; avoiding moderate exposure to vibration; avoiding all exposure to workplace hazards such as machinery and elevated heights.  (Tr. 73-75, 78).

With respect to mental limitations, Joe DeLoach, Ph.D, the state agency reviewer, opined that Limron's understanding, memory, sensorium and mental capacity are adequate for simple tasks; concentration and persistence are moderately limited; social functioning is impaired; adaptation is sufficient for the competitive work environment; and he has the capacity to perform simple repetitive tasks on a sustained basis.  (Tr. 77).

At the June 5, 2013 hearing before the ALJ, Limron testified that he suffers from significant pain in both of his hands.  (Tr. 47).  At some point, he underwent four corner fusion surgery in his right hand.  (*Id.*).  Limron demonstrated diminished range of motion in his right wrist.  (Tr. 48).  He also testified that he had similar pains in his left hand and that his doctor recommended the same procedure for that hand.  (Tr. 49).  Limron rated the pain in both hands as a six out of ten with medication and, as a result, he has difficulties holding onto objects.  (*Id.*).  He stated that he could only write two lines of a letter before needing a break.  (Tr. 50).  Regarding his fibromyalgia, Limron indicated that the pain was localized in his legs and feet.

7

(*Id.*).  To treat the swelling associated with this condition, he would recline on a couch, ice his feet and elevate them above the waist.  (Tr. 50-51).  Limron testified that he could stand for ten minutes before he needed to sit and that he could sit for ten minutes before he had to stand.  (Tr. 51).  He increases his pain medication dosage anytime he goes for an extended walk, which often results in significant swelling around his feet.  (*Id.*).  Limron uses braces for both of his wrists and one of his feet (he did not specify which one).  (*Id.*).  Limron attested that his sleeping patterns vary from three to four hours per night to 12 to 13 hours per day.  (Tr. 52).  He generally takes Ambien to help him sleep and he naps for about an hour during the day.  (*Id.*).

Concerning his mental impairments, Limron stated that he suffers from depression and anxiety attacks.  (*Id.*).  He often has mood swings and does not want to be around people.  (Tr. 51-52).  Limron indicated that he does not like crowds because he is afraid that someone will bump into his hands or step on his feet.  (Tr. 54).  He reported that "I have terrible memory.  I don't remember hardly anything."  (Tr. 53).  Limron also testified that he attempted to return to work as a truck driver but that he stopped after five weeks because of his pain and memory issues.  (Tr. 55).  On cross-examination from the ALJ, Limron stated that, although he intended to have four corner surgery on his left hand, he could not move forward with the procedure because of a dispute with his workers' compensation insurer.  (Tr. 56-57).

### 2.    *Medical Evidence*

The Court has thoroughly reviewed Limron's medical record.  In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 3.    *Vocational Expert's Testimony*

Kenneth  Browde  testified  as  an  independent  vocational  expert  ("VE")  at  the

administrative hearing.  (Tr. 58-66).  Upon examining Limron regarding the tasks he performed at his former employment, the VE rated the exertional level of Limron's past work in the heavy demand range.  (Tr. 61).  The ALJ asked the VE to imagine a claimant of Limron's age, education, and work experience, who had the exertional capacity for light work with the following limitations: a sit/stand option which would allow the individual to sit or stand often and at will, provided that they are not off-task for more than ten percent of the workday; frequent bilateral hand controls; frequent bilateral reaching overhead and reaching all over; frequent bilateral handling, fingering; occasional climbing of ramps and stairs; never climbing ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching; never crawling; limited to hearing and understanding simple oral instructions; limited to communicating simple information; avoiding hazards such as elevated heights and machinery; avoiding ordinary hazards in the workplace such as boxes on the floor, doors that are ajar, and approaching people or vehicles; moderate exposure to vibration; limited to routine and repetitive tasks; limited to simple work related decisions; occasional interaction with co-workers in a casual, small group setting; no interaction with the public; and limited to tolerating infrequent and gradual changes in the workplace.  (Tr. 61-62).  The VE testified that the hypothetical individual would not be capable of performing Limron's past relevant work as a truck driver (*Id.*), although he could perform unskilled light work such as a housekeeping cleaner (131,353 jobs in the national economy), marker (268,000 jobs in the national economy), or sample distributor (44,055 jobs in the national economy).  (Tr. 62-63).  The ALJ further inquired whether the hypothetical claimant would be able to perform the same jobs at the sedentary level with the restrictions of bilateral handling, fingering, overhead reaching and hand controls at the occasional level.  (Tr. 63).  The VE attested that the hypothetical claimant could not perform the above-listed jobs, but could

work as a surveillance systems monitor (26,618 jobs in the national economy).  (Tr. 64).  The ALJ then asked the VE to imagine a claimant with the same restrictions from the second hypothetical who "would require a daily nap which would take 90 minutes per day, out in parts of the day, in addition to the lunch break and the work break during the day." (Tr. 65).  The VE responded that such an individual would be precluded from working.  (*Id.*).

On cross-examination, Limron's attorney asked the VE whether any jobs existed in the national economy for a hypothetical individual who would be "absent from work . . . two or more days a month on a continuing ongoing basis." (*Id.*).  The VE responded that such an individual would be precluded from working.  (*Id.*).  Limron's attorney then inquired whether any jobs existed in the national economy for a hypothetical claimant who needed to elevate their feet at waist level for two to three times per day for approximately 20 to 30 minutes.  (*Id.*).  The VE answered that such an individual would be precluded from employment.  (Tr. 65-66).  Next, Limron's attorney asked the VE whether any jobs existed in the national economy for a hypothetical claimant who, "due to their memory problems and impairments was 15 percent or more off-task on a regular and continuing basis." (Tr. 66).  The VE again responded that such an individual would be unable to work.  (*Id.*).

**E.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Limron is not disabled under the Act.  At Step One, the ALJ determined that Limron had not engaged in substantial gainful activity.[1]  (Tr. 19).  At Step Two, the ALJ found that Limron has the severe impairments

---

[1] On the basis of his testimony and earnings records, the ALJ found that Limron attempted to return to his past work for a period of five weeks from April through May 2013.  (Tr. 19-20).  However, the ALJ ultimately concluded that "this work activity did not rise to the level of substantial gainful activity" as evidenced by the brief duration of the employment, the amount of time that transpired between his brief return to work and other prior work activity, and Limron's

10

of scapholunate ligament tear at the right wrists, multiple surgeries with residual degenerative arthritis, carpal tunnel syndrome, partial ligament tear at the left wrist, peripheral polyneuropathy, and depression.  (Tr. 20).  At Step Three, the ALJ found that Limron's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 21-24).

The ALJ then assessed Limron's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work, with the following limitations: a sit/stand option allowing him to alternate positions at will, provided he is not off-task for more than ten percent of the workday; occasional use of hand controls, reaching, handling and fingering with the bilateral upper extremities; occasional climbing of ramps and stairs, balancing, stooping, kneeling, or crouching; no crawling, climbing ladders, scaffolds or ropes; restricted from exposure to workplace hazards such as elevated heights or machinery and avoiding boxes on the floor, doors that are ajar, approaching people or vehicles; avoiding moderate exposure to vibration; understanding simple oral instructions and performance of simple, routine, and repetitive tasks; no more than occasional interaction with supervisors and co-workers; no interaction with the public; and routine work setting with infrequent changes that would be gradually introduced.  (Tr. 24).

At Step Four, the ALJ determined that Limron is unable to perform any past relevant work.  (Tr. 34).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Limron is capable of performing a significant number of jobs that exist in the national economy. (Tr. 34-35).  As a result, the ALJ concluded that Limron is not disabled under the Act.  (Tr. 36).

---

statement that "he was forced to stop [his attempt at] work because of a severe medical impairment."  (Tr. 20).

F.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

12

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

### G.      Analysis

In the interest of ensuring that Limron's claim for benefits is fairly considered, even in the absence of a supporting brief, the Court has independently examined the record, and evaluated the merits of the Commissioner's arguments (which were responsive to Limron's initial arguments), to determine whether the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the Court finds that the ALJ's decision was thorough and fair, and that his conclusions are supported by substantial evidence.

### 1.      *Substantial Evidence Supports the ALJ's Finding that Limron Is Not Disabled*

As set forth above, the ALJ found that Limron has the RFC to perform sedentary work with the following limitations: a sit/stand option allowing him to alternate positions at will, provided he is not off-task for more than ten percent of the workday; occasional use of hand controls, reaching, handling and fingering with the bilateral upper extremities; occasional

13

climbing of ramps and stairs, balancing, stooping, kneeling, or crouching; no crawling, climbing ladders, scaffolds or ropes; avoiding exposure to workplace hazards such as elevated heights or machinery; avoiding boxes on the floor, doors that are ajar, approaching people or vehicles; avoiding moderate exposure to vibration; understanding simple oral instructions; performing simple, routine, repetitive tasks; no more than occasional interaction with supervisors and co-workers; no interaction with the public; and routine work setting with infrequent changes that would be gradually introduced.   (Tr. 24).   Based in part on the VE's testimony, the ALJ concluded that Limron is not disabled under the Act because he is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 34-36).

### A.  Credibility

The ALJ reasonably discounted Limron's allegations of disabling limitations because, overall, they were inconsistent with the objective medical evidence and the record as a whole. (Tr. 24-34).

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain, or other symptoms, rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).   Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain, or other symptoms, is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the

claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of his symptoms are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4, at *3 (July 2, 1996); *see also* 20 C.F.R. §416.929.

Here, the ALJ evenly discussed the objective medical evidence regarding Limron's physical and mental impairments and reasonably explained why such evidence compelled a finding that his allegations of disability were not fully credible. (Tr. 21-23). With respect to Limron's alleged physical impairments, the ALJ noted that prior to the alleged onset date Limron was diagnosed with a scapholunate ligamentous tear of the right wrist after consulting with specialists at the Mayo Clinic. On May 13, 2009, he underwent arthroscopic debridement, scaphoid excision, posterior and anterior inter-osseous neurectomies, and four-corner fusion at the right upper extremity. (Tr. 168). Post-operative notes from August 2009 demonstrate that Limron was fitted for a splint; that he exhibited full range of motion in his right fingers and thumb; 20-25 degrees range of motion at the right wrist; good supination and pronation; sensory testing distally was normal; and grip strength testing revealed 50kg strength on the left wrist and 20kg strength on the right wrist. (Tr. 389). On November 2, 2009, Bassem Elhassen, M.D., noted that Limron could extend his wrist at 25 degrees and flexion at 20 degrees. (Tr. 390). Moreover, he could fully rotate his forearm "without any pain." (*Id.*). Later that month, Dr. Elhassen evaluated Limron and reported that, "[t]he patient is doing very well. He is very happy with the outcome of surgery. I gave him a paper release to go back to full duty." (Tr. 391).

In January 2010, however, Limron began to complain of pain in his right wrist after

15

returning to work, which his doctors attributed to "severe arthritic changes outside of the fusion area." (Tr. 392). These suspicions were confirmed in October 2010, when an MRI of the right wrist revealed degenerative change in the triangular fibrocartilage couple with a tear along the radial aspect; mild to moderate degenerative arthritis involving the first and fourth carpometacarpal joints; and marked degenerative changes at the distal radius. (Tr. 396). In an April 2011 report, Dr. Elhassen noted that Limron "is working as a truck driver and still complains of pain in the right wrist over this long period of time after surgery; however the pain is better than he was preoperatively." (Tr. 264). The doctor refilled Limron's prescription for a pain reliever and ordered an orthoplast volar splint to prevent irritation of the right wrist. (*Id.*). An occupational therapist evaluation dated April 27, 2011, indicated that Limron rated his health as "very good"; he rated his pain level as zero out of ten when the right wrist was at rest; the range of motion in that wrist was within normal limits; and minimal to no edema. (Tr. 262). Dr. Elhassen's August 24, 2011 examination of Limron showed positive fovea sign; mild pain at the level of the triangular fibrocartilage complex ("TFCC") origin; right wrist range of motion at 20 degrees extension and 25 degrees flexion; left wrist range of motion at 75 degrees extension and 45 degrees flexion; and grip strength measuring at 70 pounds on the right and 110 pounds on the left after three repetitions. (Tr. 260). Limron rated his pain level as "on average could go up to 9 [out of ten]." There was no gross sign of distal radioulnar joint ("DRUJ") arthritis. (Tr. 260). August 2011 imaging of the right wrist revealed "mild" degenerative hypertrophic changes at the first carpometacarpal joint and distal radius. (Tr. 267). Images of the left wrist similarly indicated slight positive ulnar variance and minimal degenerative hypertrophic changes at the first carpometacarpal joint. (*Id.*).

On October 5, 2011, two days after the alleged onset date, Limron underwent an

16

arthroscopic debridement to repair a tear in the right wrist's TFCC. (Tr. 271). Post-operative notes indicated that he was "doing better," and demonstrated "good full range of motion in his fingers and thumb," intact neurovascular function; and "some" discomfort in rotating the forearm beyond 40 degrees of supination and 50 degrees of pronation. (Tr. 272). The doctor believed Limron could be weaned off the brace in about four weeks' time. Imaging showed mild degenerative arthritis at the radiolunate and pisotriquetral joints. (Tr. 267). Occupational therapist notes from December 2011 indicated that Limron reported the pain level in his right wrist as a three out of ten; no edema; and normal range of motion in the fingers and thumb. (Tr. 259). At a visit with Dr. Elhassen in January 2012, Limron reported that although his right wrist was feeling better and "the pain is improving," he was having "more problem[s]" with his left wrist. (Tr. 258). An examination of the right wrist revealed 30 degrees flexion and 40 degrees extension; tenderness on palpation of the TFCC origin; and a positive Watson test in his left wrist. (Tr. 258). Imaging showed mild widening of the scapholunate interval. (*Id.*). In February 2012, Limron told Dr. Elhassen that "his wrist is doing well . . . as long as he does not load it, his pain is really good and minimal." (Tr. 257). The doctor elected not to perform any further surgery in the event Limron obtained new employment that did not require extensive use of his wrists. (*Id.*).

The ALJ also reviewed the records from Limron's treating physician, Paul LaClair, M.D. Notes from January 2011 (before the alleged onset date) showed that Limron was being treated for bilateral wrist and foot complaints. (Tr. 251). Limron reported that he was sleeping better; his pain had improved; and he was able to better tolerate work. (*Id.*). Sensory and nerve conduction studies of the left arm and leg revealed mild carpal tunnel syndrome with no evidence of polyneuropathy. (*Id.*). After the alleged onset date, in a January 12, 2012 report, Dr.

LaClair noted that Limron complained of diffuse pain. Limron also stated that his pain is better controlled when his mind is "busy" and that his medication regimen controlled his pain. (Tr. 248). Dr. LaClair found that Limron had equal and adequate strength bilaterally in his lower extremities and that his foot pain significantly dissipated with extended periods of massage. (*Id.*). The doctor continued Limron's medication regimen. (*Id.*). At his three-month follow up, Limron reported significant lower limb and foot pain as well as hand symptoms. (Tr. 281). Dr. LaClair's examination showed diminished bilateral grip strength and tenderness of the wrists. The doctor again continued Limron's medication regimen. (*Id.*). At a March 12, 2013 visit, Limron informed Dr. LaClair that his pain symptoms were "very severe," with burning nerve pain in his hands and feet. (Tr. 365). He exhibited decreased flexion and extension in his right wrist and decreased strength in his right hand grasp as compared to his left hand. (*Id.*). At this juncture, the doctor changed his medication regimen. (*Id.*).

Limron's treating rheumatologist, Carlos Diola, M.D., examined him in February 2011 (before the alleged onset date) and noted no sclerodactyly or dactylitis; no synocial thickening; and no chronic rheumatoid deformities. (Tr. 354). Tenderness was evident by the right metacarpophalangeal joints along with early osteoarthritic changes in the right wrist. (*Id.*). The right wrist was also swollen with ankylosis and tender. (*Id.*). The left ankle was puffy, but not tender, and the plantar aspect was tender. (*Id.*). The doctor noted less than 11 tender points. (*Id.*). In July 2011, Dr. Diola saw Limron after complaints of pain in his feet and lower legs. (Tr. 349). Although no swelling was noted in the feet, and Limron did not report any numbness, tingling or burning sensations, Dr. Diola continued to diagnose peripheral polyneuropathy. (*Id.*). He did note that this diagnosis was "[s]uspicious particularly with symptomatic improvement from Gabapentin," a medication used to treat neuropathy. (*Id.*). In October 2011, Dr. Diola

18

indicated that the Gabapentin continued to help with the numbness, tingling, and burning sensations in the feet.  (Tr. 347).  Limron complained that his hands continued to hurt him.  (*Id.*).  By October 2012, Limron reported that the Neurontin was helping him with pain management and that he was able to function and sleep better, although he also indicated that some of the medication left him with a "drunk feeling."  (Tr. 343).  His left wrist and hand continued to bother him as well.  Limron exhibited mild metatarsophalangeal puffiness in the feet and mildly tender heels, but informed Dr. Diola that his evaluation for plantar fasciitis was negative.  (*Id.*).

The ALJ also evaluated the August 2012 consultative physical examination performed by Siva Sankaran, M.D.  During the examination, Limron complained of left wrist pain and was contemplating surgery due to degenerative arthritis, or possibly, tendonopathy.  (Tr. 313).  He reported taking several medications, which controlled the pain in his right wrist when it was at rest.  (*Id.*).  Limron presented symptoms of numbness in the legs coupled with neuropathic severe pain, although he did not use a cane or walker.  (*Id.*).  Dr. Sankaran found that Limron's motor system was normal; deep tendon reflexes were at 2+; and he had decreased touch-pain sensation from the knees down to the ankles and feet that were "suggestive of peripheral neuropathy."  (Tr. 314).  The doctor indicated that Limron exhibited ambulatory walking with a waddling gait; he could touch his toes and squat completely; no evidence of edema; his right hand grip measured 20 pounds with positive Tinel's sign indicative of carpal tunnel syndrome; his left hand grip measured 30 pounds with decreased range of motion and no swelling; and he could open a jar, button clothing, write legibly, pick up a coin and tie his shoelaces with either hand.  (*Id.*).  Limron displayed full spinal range of motion; normal range of motion in all of his fingers and both hands; but limited right wrist mobility of 15 degrees for both dorsiflexion and palmerflexion and 30 degrees for both of these measures in the left wrist.  (Tr. 319).  Dr.

Sankaran diagnosed Limron with arthritis in the left wrist; peripheral neuropathy in both legs "of unknown etiology"; and post-surgical pain in the right wrist with decreased grip.  (Tr. 315).

Regarding Limron's mental limitations, his treating psychiatrist, Sachin Nagarkar, M.D., initially noted in January 2011 (before the alleged onset date) that Limron was devastated by his inability to perform his past work.  (Tr. 342).  Limron worried about his source of future income and paying the mortgage on his home.  (*Id.*).  The doctor indicated that his mood and affect were depressed and he assigned Limron a Global Assessment of Functioning ("GAF") score of 50.[2] After Limron was placed on anti-depressant medication, the psychiatrist noted that his mental status exams were within normal limits; he did not exhibit any significant clinical abnormalities; and Limron noted several trips to Tennessee with his wife and friends (one of which occurred in summer/fall 2012).  (Tr. 334, 336-38).  Additionally, Dr. Nagarkar prescribed the same dosage of anti-depressant medication throughout the treatment period from January 2011 through November 2012.  (*Id.*).

After evaluating the above medical evidence, the ALJ found that Limron was less than fully credible, and could perform a range of sedentary work consistent with the limitations imposed in the RFC.  (Tr. 33-34).  It is clear that, in reaching this conclusion, the ALJ thoroughly and fairly discussed the evidence both in favor of, and against a finding of disability. (Tr. 26-27) ("Certainly, the longitudinal medical evidence strongly corroborates the claimant's reported history of pain and functional difficulties with the right wrist…Although this brief summary of claimant's medical and psychiatric treatment does support the existence of symptoms and diagnoses for which the claimant alleges prevent him from working, the objective

---

[2]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

signs and results of diagnostic laboratory testing, while significant, are not entirely proportionate

with an inability to sustain sedentary work activities with the [imposed RFC].").

The ALJ's finding that Limron was not entirely credible is supported by substantial

evidence.  The ALJ noted that after Limron underwent surgery on his wrist, his pain was "better

than" it had previously been, and that tested positive only for "mild" median neuropathay of the

left wrist.  (Tr. 27).  The ALJ also noted that Limron suffered the most severe symptoms prior to

the alleged onset date, and that as of that time, he was still working as a truck driver and/or in the

office in a "light duty" capacity.  (*Id.*).  Thus, even at their worst, Limron's conditions did not

prevent him from working.  Evidence further showed that his relative condition improved both

leading up to, and after his alleged onset date.  As the ALJ noted:

> In the months leading up to the [alleged onset date]…x-rays of the right
> wrist … revealed only "mild" degenerative hypertrophic change…which
> suggests that the interim arthroscopic debridement was significantly
> effective.   Contemporaneous radiographs of the contralateral left wrist
> revealed only "minimal" hypertrophic changes…, no joint-space
> narrowing, active range of motion, minimal to no edema (swelling), and
> intact sensation.  [Limron] reported "0" pain at rest in that joint…At the
> time of his postoperative casting of the right arm…[Limron] still showed
> good range of motion at the fingers and thumbs, intact neurovascular
> functioning…normal mobility of the thumb and fingers.  The final two
> documented encounters with Dr. Elhassan in January-February 2012 report
> still preserved grip strength of 60 pounds on the right and generally doing
> well in terms of having "minimal" pain "as long as he did not load it."

(Tr. 27-28) (internal citations omitted).  Thus, while the ALJ concluded from the foregoing

objective findings that Limron suffered from "considerable abnormalities," he appropriately

concluded that they "support an exertional restriction in lifting/carrying to sedentary work" and

that "no further degree of limitation in these respects is supported given the findings toward

improved symptoms in the right wrist, not fully consistent with the testimony, and the mild

issues noted clinically and on postoperative x-rays."  (Tr. 28).  As to impairments impacting

Limron's feet, the ALJ was equally fair and balanced.  He weighed the fact that Limron denied numbness or tingling/swelling in his feet, that Limron's last office visit showed only "mild" puffiness in the feet and mildly tender heels, that he tested negative for any distal neuropathy in the lower limbs, and that he had "adequate and equal strength in both lower extremities," against evidence that Limron presented with "significant" lower limb and foot pain, exhibited "some sensitivity in the feet" and "pain with palpation," and was diagnosed with peripheral neuropathy. (Tr. 29).  In weighing these competing findings, the ALJ did not err in concluding that overall, "the treatment notes do not support any degree of symptoms and limiting effects thereof, with prescribed treatment, that would prevent [Limron] from standing and walking for just two total hours of an eight-hour workday as involved in sedentary work…"  (*Id.*).[3]  The ALJ also appropriately found that the record did not contain objective findings that Limron suffered from extensive memory deficits or levels of depression and anxiety affecting his ability to work with others.  (Tr. 30-32).  For instance, he noted that once Limron began taking anti-depressant medication he "quickly reported improved sleep…with [Dr. Nagarkar] consistently documenting clinical findings on mental status examination to be within normal limits.  From June 2012 through May 2013, [Limron] continued to demonstrate no significant clinical abnormalities," and he was maintained on the same medication he had been on while working.  (Tr. 30).  Thus, the Court finds no reason to disturb the ALJ's credibility assessment.

Moreover, the law is clear that the mere fact that certain aspects of the record may be

---

[3] Further supporting the ALJ's analysis is Dr. Sankaran's consultative physical examination. Again, the ALJ fairly recognized that this examination is merely a "snapshot of [Limron's] functioning during the period considered," but he properly found that it "strongly supports the [RFC he determined] as Dr. Sankaran, while noting some pain experienced by Limron, found that he had normal motor power, was able to walk in a tandem fashion, squat and recover completely, could use his hands to open a jar, button clothing, write legibly, and tie his shoes. (Tr. 29).

consistent with the Limron's alleged impairment does not necessitate a finding that the claimant was fully credible regarding *the extent* to which his symptoms can be attributed to the impairment.   This is precisely why the ALJ must consider and weigh "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of his symptoms are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4, at *3 (July 2, 1996); *see also* 20 C.F.R. §416.929.   Again, the Court finds that the ALJ conducted a thorough and fair review of the medical evidence, as well as Limron's testimony, and reasonably determined based on that review that he was not entirely credible to the extent his claimed level of physical impairments exceeded the RFC assessment.  (Tr. 26).  Thus, Limron has not shown that the ALJ's overall evaluation of the evidence was in any way erroneous; indeed, it is supported by substantial evidence.

In view of the foregoing, the Court concludes that Limron has not shown a "compelling reason" to disturb the ALJ's credibility determination.  *Smith*, 307 F.3d at 379.

B.       The ALJ's Evaluation of Treating Source Opinions

Social Security regulations require ALJs to give treating source opinions controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." *Blakley*, 581 F.3d at 406 (internal quotations omitted).   While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" – such weight is only appropriate if the opinion is well-supported and consistent with the record as a whole.  *Soc. Sec.*

23

*Rul.* 96-2p, 1996 SSR LEXIS 9, at \*5 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (stating that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §416.927(c)(2) (requiring the ALJ to provide "good reasons" for weight given to treating source opinion).

Insofar as Limron could assert that the ALJ improperly evaluated the medical opinions of Dr. Elhassen's physician assistant, Mike Nigbur, and Dr. Nagarkar, this contention lacks merit.

First, the ALJ appropriately discounted Mr. Nigbur's statement on the May 8, 2012 work status report that Limron is "unable to work at all" (Tr. 244), because this opinion speaks to whether Limron is disabled, which is a legal conclusion specifically reserved for the Commissioner. *See e.g., Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 474 (6th Cir. 2008) (stating that "[a] physician's opinion that a claimant is disabled is entitled to no deference because it is the prerogative of the Commissioner, not the treating physician, to make a disability determination."). The ALJ also properly concluded that Mr. Nigbur's opinion was not entitled to deference because, as a physician assistant, he is not an "acceptable medical source." *See Soc. Sec. Rul.* 06-03p, 2006 SSR LEXIS 5, at \*3-5 (2006) (stating that physician assistants are not "acceptable medical sources" whose medical opinions may be entitled to controlling weight.);

24

*Doyle v. Comm'r of Soc. Sec.*, No. 13-12916, 2014 U.S. Dist. LEXIS 115307, at *48 (E.D. Mich. Jul. 28, 2014) (noting that physician assistants are not an "acceptable medical sources"). In any event, under the circumstances, Mr. Nigbur cannot be considered a treating source since the record reflects that he treated Limron on no more than two occasions. *See* 20 C.F.R. § 404.1527(c); *Kornecky*, 167 F. App'x at 506 (holding that "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship.") *see also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Cir. 2011) (stating that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source."). Moreover, Mr. Nigbur opined that Limron would not be able to work for a period of nine months, which otherwise fails to satisfy the 12-month durational requirement for a disability under the Social Security Act. *See* 42 U.S.C. §423(d)(1)(A).

Second, the ALJ correctly afforded "little weight" to Dr. Nagarkar's conclusion that Limron was "totally and permanently disabled" and that "he is unable to handle a full 8 hr. day." (Tr. 399). As the ALJ noted, Dr. Nagarkar's opinion "represent[ed] the first time such issues were documented" (Tr. 33), and they appeared to be based entirely upon Limron's subjective complaints. *See Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) ("There is no indication that Dr. McFadden's opinion was supported by anything other than Bell's self-reports of his symptoms. Such reports alone cannot support a finding of impairment."). And, as noted above, *see supra* at 22, the ALJ discussed why Dr. Nagarkar's opinion was belied by his own treatment records which showed that once Limron began taking medication, Dr. Nagarkar consistently "document[ed] clinical findings on mental status examination to be within normal limits." (Tr. 30).

25

Thus, the level of deference that the ALJ gave to each of the treating source opinions is supported by substantial evidence.

### C.   VE Hypothetical

To the extent Limron could challenge the ALJ's decision to not include in the VE hypothetical requirements that he be able to nap for 90 minutes during the workday, elevate his feet at intermittent times throughout the workday, and be absent from work more than two days per month on a continuing basis, such challenge lacks merit. Although the VE testified that these limitations, if imposed, would preclude all competitive work, (Tr. 65-66), the ALJ appropriately omitted such limitations because no evidence exists in the record for imposing them. *See Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003) (an ALJ is only required to pose those hypothetical limitations that he finds credible); *see also Cookman v. Comm'r of Soc. Sec.*, No. 13-10687, 2013 U.S. Dist. LEXIS 176870, at *24-25 (E.D. Mich. Dec. 17, 2013) (same). As such, any argument that the ALJ formed an inaccurate hypothetical is without merit.

For all of the above reasons, after independently reviewing the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's motion for summary judgment [11] be GRANTED and the Commissioner's decision be AFFIRMED.


Dated: June 13, 2016                        s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 13, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

27